SAMUEL ATKIN et al., Appellants-Respondents, v. HILL, DARLINGTON & GRIMM et al., Respondents-Appellants.

First Department, February 8, 1962.

*Arnold I. Burns* of counsel (*Stanley T. Lesser* and *Jay D. Fischer* with him on the brief; *Burns & Lesser,* attorneys), for appellants-respondents.

*Thomas W. Hill, Jr.,* of counsel (*George Zeidenstein* and *Charles Krupin* with him on the brief; *Spear & Hill,* attorneys), for respondents-appellants.

BOTEIN, P. J. Denials of plaintiffs' motion and defendants' cross-motion for summary judgment raise questions relating to the construction of section 51 of the Insurance Law, which reads in part as follows:

"1. No person, firm, association or corporation shall, except as provided in subsection six, in this state sell or propose to sell to the public any note, stock, treasury stock, share, bond, debenture, evidence of indebtedness, certificate of interest or participation, voting trust certificate, certificate of deposit for a security, pre-organization certificate of subscription, investment contract, or other security of any insurer not authorized to do business in this state, unless licensed so to do pursuant to the provisions of this section. No person, firm, association or corporation shall, except as provided in subsection six, in this state issue, circulate or distribute any advertisement, circular, letter or other public announcement in connection with the sale or proposed sale of any securities of any insurer unless a copy of such announcement has been filed with the superintendent and approved by him.

\* \* \*

"6. This section shall not apply to the selling or proposing to sell securities after one year from the first date upon which the security was offered to the public in this state."

The three plaintiffs in this action were customers of the stock brokerage firm of Grimm & Co., which with its partners will be referred to as defendants, since the actual parties defendant are their successors in interest. On various dates in 1959 and 1960 plaintiffs purchased from or through the defendants shares of stock of Colorado Credit Life, Inc., (Colorado). Whether defendants acted as principals or as plaintiffs' agents is in dispute; for the purposes of these motions we must assume they acted as principals. Some three months after the last of

the transactions plaintiffs rescinded or attempted to rescind all of them, and now seek to recover the aggregate purchase price, offering to return the purchased shares.

They seek to justify this relief on the ground that the transactions were, on defendants' part, in violation of section 51 because, and these facts are undisputed, Colorado is a foreign insurance corporation not authorized to do business in New York and defendants had not been licensed by the Superintendent of Insurance to sell Colorado stock to the public. So far as appears, and we may not assume otherwise upon the papers submitted by the moving parties, the shares involved in the transactions had been owned in New York and acquired from their owners by the defendants in the New York over-the-counter market; and defendants had never introduced, or in any manner participated in the introduction of, these shares or of any other Colorado stock into New York. As the parties seem to assume that the sales were " to the public ", we shall do so, without being understood as having passed expressly on the point.

Defendants contend that subdivision 6 exempts the transactions. If it does not, they argue, violation of the statute entails no civil liability of the nature plaintiffs seek to enforce. The nub of this argument, which it is convenient to consider first, is that section 51 provides no remedy by its terms, and that the criminal penalty prescribed by section 5 for violation of any provision of the Insurance Law was intended to be exclusive.

Subdivision 2 of section 51 authorizes the Superintendent of Insurance to issue a license for a term of one year " to a named person, firm, association or corporation to sell and propose to sell to the public in this state the specified securities of a specified insurer." He may refuse to issue a license and may after notice and hearing revoke a license if in his judgment such action will best promote the interests of the people. In determining whether to grant a license the Superintendent considers pertinent information specified in subdivision 2 as to the securities proposed to be sold, the seller and the issuer. " The applicant for such a license shall submit a written application therefor, verified under oath in this state and containing such information as the superintendent may require, including the following: the name, residence address, business address in this state and previous business experience of the applicant and of such insurer and of his or its officers, members and employees, and information as to their trustworthiness; a copy of every security which is to be offered for sale: a statement in detail as to the financial condition and the plans and purposes of the insurer, the amount and par value of securities and the

selling price thereof, the manner in which the proceeds of sale are to be spent or employed, the rate of commissions to be paid for the sale of securities, the salaries to be paid to officers of such insurer, and the safeguards to be provided against diversion of proceeds from the plans and purposes set forth. Before issuing any such license the superintendent may make such examination of the affairs of the proposed licensee and of such insurer as he may deem expedient. * * * No license to sell or to propose to sell the securities of any foreign or alien insurer shall be issued unless such insurer is qualified to obtain a license to do an insurance business in this state.''

[Under section 42 a foreign insurer desiring to do business in New York submits, among other things, a full statement showing its assets, liabilities and financial condition, and the Superintendent '' may also require a full statement of its income and disbursements, business done, and other facts required to be shown in the annual statement of such an insurer.'']

Quite evidently the Legislature had much more in mind than regulation of dealers in securities of insurers not authorized to do business in this State. It clearly desired the specific security and its issuer to be sufficiently sound, in the judgment of the Superintendent, to warrant the purchase of the security by our citizens with a reasonable degree of safety. Of course, as other provisions of section 51 make clear, the grant of a license is not to be deemed a recommendation of the security by the Superintendent; but there is no doubt that the legislative purpose was to assure buyers that, in the view of a knowledgeable official, and subject to the risks inherent in any investment, the security was one of integrity. The contemplation was that the Superintendent would '' establish standards, for the protection of the public, to which the securities must conform in order that their sale be permitted '' (Insurance Law Revision, Tentative Draft 1937, Prepared by the Insurance Department of New York, pp. 47, 48). Or as the then Superintendent put it in his Fifty-third Annual Report (Part 1, p. 38 [1912]), when he suggested the enactment of the forerunner of section 51 (L. 1913, ch. 52, adding § 66 to Insurance Law of 1909, as amd. by L. 1930, ch. 363): '' The same reasons which led government to examine and, in effect, to certify to the reliability of corporations that furnish insurance to the people also require — and probably with even greater force — that government examine and certify as to the reliability of insurance promotions '' (see, also, Fifty-second [1911] and Fifty-fourth [1913] Annual Reports, Part 1, pp. 21 and 11, respectively).

Certain stringencies of the orginal enactment have been relaxed in section 51, but where the statute is applicable its endeavor to protect the public is thus seen to be so emphatic that allowance of rescission in a proper case is in our opinion essential to carry out the Legislature's intent (see *Garey* v. *Huff Co.*, 135 Misc. 138). Public protection, to be sure, is the ultimate aim of other licensing statutes in which no intent to add civil to criminal liability has been found (*Rosasco Creameries* v. *Cohen*, 276 N. Y. 274; *Sajor* v. *Ampol, Inc.*, 275 N. Y. 125; *Fosdick* v. *Investors Syndicate*, 266 N. Y. 130; *Mahar* v. *Harrington Park Villa Sites*, 204 N. Y. 231).

But none of the statutes concerned in those cases was designed to assure the merit of the transaction under consideration or the quality of its subject matter. In *Sajor*, where a seller of stock omitted to file a simple identifying notice required for the information of the Attorney-General, the court pointed out that the notice "in no way affected the plaintiff's purchase. Such a statement had no relation whatever to his transaction" (p. 130). In *Rosasco*, where milk dealers sought to avoid payment for milk sold them by an unlicensed dealer, the court said: "Nor was the statute enacted for the purpose of protecting dealers such as the defendants", and it intimated that assurance of the purity of milk was not the underlying statutory objective (p. 280; cf. Agriculture and Markets Law, arts. 4, 4-A). Similarly, in *Fosdick* and *Mahar*, where foreign corporations had failed to qualify to do business in New York, such qualification would have had no bearing on the particular transactions involved; as the court in *Fosdick* pointed out (p. 134), the specific transaction before it could be denounced as void only by denouncing every business activity of the foreign corporation in New York. In none of these cases would compliance with the applicable statute have halted the transaction; noncompliance had not "in any manner entered into, affected or tainted it" (see *Merchants' Line* v. *Baltimore & Ohio R. R. Co.*, 222 N. Y. 344, 347).

It is true that in *Rosasco*, for example, had plaintiff there sought and been refused a license and therefore not sold the milk, the transaction would not have occurred. In this sense there was a connection between statute and transaction, but it was too remote to sustain an inference of legislative intent to impose such a harsh penalty as forfeiture of the purchase price. The statute was not a commodity inspection law; the purchasers of the commodity were satisfied with its quality; whether the seller was licensed or not was immaterial to them

in the specific transaction. Such circumstances, as we need not be prompted, are not necessarily determinative; the statements in the preceding sentence might be made with respect to a statute controlling traffic in liquor, yet a different result may follow (see *Rosasco*, p. 280; cf. *Carmine* v. *Murphy*, 285 N. Y. 413). There is no inconsistency. Legislative intent remains the touchstone. All know that liquor licensing statutes are designed to promote temperance for the sake of preserving health and good morals, and that the failure of purveyors to obtain a license may contribute proximately to defeat of the design. In such circumstances intent to visit civil sanctions on the transgressor may more readily be inferred; that his compliance or noncompliance with the statute was immaterial to his purchaser becomes of less moment. For every transaction is meaningful to the State in an area in which it wishes to protect members of the public, even against their own inclinations.

Section 51 is akin to a commodity inspection law. The State may wish a security to be sound just as it may wish a foodstuff to be wholesome. "The principle applies as well to securities as to material products, the provisions of the law necessarily varying with the objects " (*Hall* v. *Geiger-Jones Co.*, 242 U. S. 539, 552). The proceedings contemplated by the section with respect to a security have a direct bearing on the transaction of its sale and purchase. Grant of a license application means an official and impartial judgment that investment in the security is at least rational. Denial means that a prejudicial investment may well be forestalled. These benefits the Legislature wanted the investor, within the limits of section 51, to have, whether he wished them or knew of them. Noncompliance with the statute may thus involve a serious deprivation. Restoration of the parties to their original positions seems to us distinctly within the statutory intent and a remedy by no means disproportionate to the offense.

Concluding, therefore, that rescission is appropriate relief for a violation of section 51 of the type alleged by plaintiffs, we turn to the contention that no violation occurred. Defendants inform us preliminarily that for years, without official complaint, a large number of unlicensed New York dealers have traded extensively and openly in the securities of insurance companies not authorized to do business here. Defendants' purpose apparently is to show an understanding on the part of the financial community and perhaps of enforcement agencies that section 51 does not forbid such trading. But following this line of argument leads us to unprofitable by-paths of speculation.

Defendants' substantial reliance is on the subdivision 6 exemption. They assert that their transactions took place " after one year from the first date upon which the security was offered to the public in this state." Plaintiffs contest the assertion but, demurring to it *arguendo*, submit that subdivision 6 embraces only securities which have been once licensed for sale; or, if not, only securities sold or offered to the public prior to January 1, 1940, the effective date of section 51 (Insurance Law § 601). The latter interpretation is supported by an opinion of counsel to the Insurance Department given after the instant dispute matured and evidently with awareness of it. Thus, while we have considered it carefully, it may not be accorded the weight customarily attaching to an agency's practical construction of the statute it administers (see *Beck* v. *Teachers' Retirement Bd.*, 15 A D 2d 223, 228).

Since on its face the exemption expressed in subdivision 6 plainly appears to be of a continuing nature and since a similar but more embracing exemption of securities sold or offered to the public prior to January 1, 1940 could have been easily expressed, if intended, we are constrained to conclude that the intent was otherwise. But the existence of such an interpretation, and its conflict with the other interpretation proffered, illustrate the difficulties which ensue if subdivisions 1 and 6 are not given the sense of their natural reading.

The statute, in the aspect under discussion, should be read, it seems to us, as a dealer in the position of defendants would reasonably read it. Consulting subdivision 1, he would find his proposed sale to the public forbidden except as provided in subdivision 6. Consulting that subdivision, he would find his proposal permissible if a year had elapsed since the first date on which the security was offered to the public in New York. Confronting him would be the ascertainment of that date, and if he found that the security had been traded in the over-the-counter market for at least a year, he would conclude — sensibly, we should think — that the date must have been a year or more in the past. Nor would it normally occur to him to inquire when the specific securities he proposed to sell were first offered in New York. He might also seek to consult the official regulations which subdivision 5 of section 51 authorizes the Superintendent to make to effectuate its purpose; if he did, he would evidently find none of pertinence, since none is cited to us. We do not believe the Legislature intended to penalize him for following this natural and rational course.

Plaintiffs support their first interpretation — that subdivision 6 applies only to securities once licensed for sale — by inferences drawn from the history of the origin of section 51. The inferences seem to us to tend the other way. The predecessor of section 51 contained no exception corresponding to subdivision 6. When the Insurance Department undertook a recodification of the insurance laws in 1935, the committee charged with the task kept minutes of its proceedings, though not in verbatim form. It is to these minutes plaintiffs refer us. They show that the penultimate draft of what finally became section 51 exempted the sale of "any listed securities on any securities exchange which is under the supervision of the Securities and Exchange Commission of the United States." One member of the committee stated that, if the exemption was to continue, it should include all securities subject to commission supervision including over-the-counter sales; a second moved to strike out the exemption; a third stated that the supervision of the commission was not as exacting as that of the Insurance Department. In the end the exemption now contained in subdivision 6 was approved. The purpose of the exemption, the minutes recite, "is to prevent the section from being applicable to the stock of recognized insurance companies which has been dealt in on the exchanges or over-the-counter by a great many private individuals, and all stock which has been on the market for more than a year will then become exempt."

Significantly, there was no indication of an intent to confine the exemption to securities originally sold under license and, although the license period under section 51 extends for one year, no indication of an intent to relate the "one year" in subdivision 6 to the license period, which might or might not be coterminous. If the committee intended to exempt from the statute only sales of a security with respect to which a license had once been issued, why did it defer the exemption for a year after the public offering? A grant of a license presumes that the security has passed the Superintendent's critical scrutiny as fit for purchase by the public; why then should the committee not have permitted free trading immediately? Plaintiffs suggest no explanation.

We think the committee was faced with the same problem which confronted the framers of the Federal Securities Act of 1933 and resolved it in the same way, as far as the issue in this case is concerned. Securities originally distributed in breach of the regulatory statute come into the hands of innocent pur-

chasers, whether "private individuals" or dealers, and a market develops. Shall the trading be permitted and, if so, on what conditions? With respect to such dealers the Congressional resolution was to prohibit "transactions within one year after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter" (Securities Act of 1933, § 4, subd. [1]; U. S. Code, tit, 15, § 77d, subd. [1]). That Congress intended to allow sales of securities originally distributed unlawfully after one year had elapsed is confirmed by the reports of the House Committee on Interstate and Foreign Commerce and the Senate Committee on Banking and Currency when, in 1954, the one-year period was shortened to 40 days.*

That the revisers of our insurance laws had the Securities Act of 1933 before them is known; indeed, the minutes recite that subdivision 1 of the penultimate draft was changed so as in part "to conform to § 2 of Article I of the Securities Act of 1933." Every likelihood is that in considering the exemption to be incorporated in section 51 the committee consulted the Securities Act exemption provisions.

To hold that a dealer in defendants' position is exempted by subdivision 6 is to hold that, after the security has been on the New York market for a year, he may trade as freely as any private investor. We do not believe the aims of section 51 are frustrated by such tolerance. A reason exists for flatly barring dealer sales for a limited time after the unlawful public distribution starts, whether the sales are by a dealer participating

---

* "Section 6 of the amended bill amends the third clause of section 4 (1) of the Securities Act by reducing from 1 year to 40 days the period during which transactions, by dealers not participating in the distribution, are not exempt from the provisions of section 5 of the act.

"Apart from the change to a 40-day period, the amendment is not designed to affect the nature or extent of the dealer's exemption in section 4 (1). For example, in the case of an unlawful offering of unregistered securities, a dealer would not be able to trade lawfully in such securities within 40 days (1 year under the present act) after the date on which the unlawful distribution of such securities to the public in fact commenced. And if the dealer is a participant in any such unlawful distribution he cannot lawfully effect transactions in the unregistered securities so long as he is engaged in the distribution even though the 40-day period has expired. * * *

"In the case of registered securities the dealer's exemption will not be available to any dealer participating in the distribution so long as he has an unsold allotment or subscription, but dealers who are merely trading and are not participants in the distribution will be subject to the provisions of section 5 of the Securities Act only during the 40-day period." (83d Congress, 2d Sess. 1954, House of Representatives Report, No. 1542, p. 22; Senate Report No. 1036, p. 14, 83d Congress 2d Sess. 1954, and, see, 1 Loss, Securities Regulation, p. 257.)

in the distribution or by one not participating.* Once that time — the year referred to in subdivision 6 — has elapsed, there appears to be no valid basis for differentiating between a seller in the position of defendants and any other seller *merely* because the former is engaged in the securities business and the latter not. Securities may be more widely dispersed as a result of dealers' transactions, but this seems no factor of appreciable weight after normal trading succeeds the distribution process, especially since it is common knowledge that stockholders customarily sell through dealers.

Subdivision 6 came into the law after many years of experience with the original legislation. What prompted the then Superintendent to recommend the 1913 statute was the wave of formations of spurious insurance companies in other States, in which unwitting New Yorkers were decoyed to invest. Thus, the annual reports above cited speak of "insurance promotions", of "promoters still busy in organizing more or less mythical

---

* At first blush it may seem an injustice that a nonparticipating dealer (i.e., one free of wrongdoing), having innocently purchased the security, should be prohibited from disposing of it, like the ordinary purchaser, when he chooses. But the fact remains that he is by occupation in the channels of distribution and if his offering is made while the process of distribution is still going on, it contributes to the process. A statutory deterrent, effective until the distribution has been concluded, may on balance therefore be desirable. Moreover, the dealer subject to such a deterrent, as well as his culpable brother, may evasively claim that the securities comprising his offering were not acquired by him while the distribution was in process but were acquired after it ended (see 1 Loss, *op. cit., supra*, p. 183). On the assumption that the distribution process would normally be completed within a year, the Securities Act in its original form dealt with these considerations by prescribing one year after the commencement of the distribution process as a period of nonexemption for both participating and nonparticipating dealers, the former continuing nonexempt if and while still occupied in distributing (see Throop and Lane, Some Problems of Exemption under the Securities Act of 1933, 4 Law and Contemporary Problems 89, 120).

The one-year nonexemption period in the Securities Act had an additional purpose, namely, to require dealers, whether or not participating in the distribution, to deliver a statutory prospectus in connection with their sales of a duly registered security during the year, and, in the case of a participating dealer, to continue to deliver it as long as he was engaged in the distribution even though the year had expired (see the Reports of the Committees of Congress above cited). That this additional purpose is not present in section 51 to the same extent seems immaterial. (In fact a somewhat similar purpose is discernible in the section, even though it does not mandate the use of a prospectus. For if one is used during the year it must be filed with the Superintendent and approved by him.) It seems immaterial, too, that the Securities Act is less rigorous than section 51 in the sense that it relates primarily to disclosures to be made about the security rather than to standards to which the security must conform. In the respect considered in this opinion, the two enactments would seem to reflect one policy.

insurance companies '', of '' the stock of a company which is but a name '', and in 1930 the Seventy-First Annual Report (Part 1) described '' the original intent of the Legislature '' to have been '' that the Insurance Department should supervise the promotion and sale of stocks of insurance companies in process of organization only '' (p. 31). Section 51, like its predecessors, is, however, more broadly expressed, and not even the defendants suggest, as in 1929 did the defendant in *Garey* (135 Misc. 138, 140, *supra*) that the legislation reaches only sales '' in connection with the promotion or initial distribution of the securities ''. But the committee of insurance law revisers could not have been unaffected by the changes in financing and marketing practices wrought by time and, more specifically, by the Securities Act of 1933 and the Securities Exchange Act of 1934. It is likely that, through subdivision 6, they were seeking a suitable accommodation to those changes and we believe our interpretation carries out their intent.

We are not called on, however, to ascertain the committee's subjective intention. Its expressed intention is at the least ambiguous; and neither confirms nor rejects definitely the speculative inferences indulged in by the parties.

Rejection of plaintiffs' interpretation of subdivision 6 requires us to consider defendants' assertion that the transactions occurred more than a year after the first offering of Colorado stock to the public in this State. On this factual question, however, the parties are also in collision and in our opinion a triable issue exists. Problems under section 51 are posed, too, by other matters as to which the facts are in dispute; e.g., whether defendants acted as principals or as agents, and whether they or plaintiffs solicited the transactions. These issues cannot be determined upon the papers submitted herein, and a trial is indicated at which the full facts can be developed. This holds true especially since argument has been devoted chiefly to the two main points discussed above.

The orders denying the motions, to the extent respectively appealed from, should be affirmed, on the facts and on the law, without costs.

BREITEL, VALENTE, McNALLY and STEUER, JJ., concur.

Orders entered on July 17, 1961 and September 15, 1961, so far as appealed from, unanimously affirmed on the law and on the facts, without costs.