**AMERICAN BANK & TRUST COM-PANY, Plaintiff,**

v.

**BARAD SHAFF SECURITIES CORP. et al., Defendants.**

**No. 70 Civ. 4876.**

United States District Court, S. D. New York.

Jan. 5, 1972.

Guzik & Boukstein, New York City, for plaintiff by Leo Guzik, Joseph H. Ein-stein, Lawrence Lefkowitz, New York City, of counsel.

Harry T. Sherman, New York City, for defendant Barad Shaff Securities Corp. by Louis I. Newman, New York City, of counsel.

Gregory D. Erwin, Omaha, Neb., Clare & Whitehead, New York City, for defendant Equivest Corp.

GURFEIN, District Judge.

This is a set of two motions to dismiss the amended and supplemental complaint, both pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure on the grounds that: (1) the Court lacks jurisdiction of the subject matter of the action by reason of the plaintiff's lack of standing; and (2) the complaint fails to state a claim upon which relief can be granted. The motions are made on behalf of two of the defendants, namely, Barad Shaff Securities Corp. ("Barad") and Equivest Corporation ("Equivest").

The amended and supplemental complaint (hereinafter the "complaint"), sets forth the following:

American Bank & Trust Company ("American") clears securities for certain of its stock broker customers. It receives stock bought by brokers and pays the persons delivering the stock. In effect, it thereby makes a loan to its customer. American then delivers the stock to its customer broker, or as the latter directs, against payment, out of which American reimburses its advance (Compl. ¶10). One such broker customer of American was Wanderon and Co., Inc. ("Wanderon") (Compl. ¶11). Wanderon had executed a loan and collateral agreement in favor of American (Compl. ¶12).

The stock involved in the action is that of At-Your-Service Leasing Corp. ("AYSL"). On or about April 8, 1970 the SEC issued an order, pursuant to Regulation A, promulgated under Section 3(b) of the Securities Act of 1933, authorizing exemption for the public offering of AYSL stock by TDA Securities, Inc. ("TDA") as underwriter (Compl. ¶13). However, TDA never made any

bona fide offering of the stock to the public, as described in the offering circular; nor did TDA make any public distribution of the stock. The SEC has now permanently suspended the Regulation A exemption previously issued (Compl. ¶14).

Before August 19, 1970 TDA telephoned Wanderon and suggested that Wanderon enter a quotation for AYSL in the "pink sheets" maintained by the National Quotation Bureau, Inc. at prices in excess of the original $3 per share offering price, and Wanderon did so. In connection with this listing, TDA told Wanderon that it should advise TDA of all offers of AYSL to Wanderon so that TDA could consider repurchasing that stock from Wanderon (Compl. ¶15). On August 17, 1970 TDA sold 27,500 shares of AYSL at approximately $6 per share to various brokers including 8,500 shares to the moving defendant Barad and 8,000 shares to the moving defendant Equivest (Compl. ¶16). On the same day an employee of Barad, the defendant Garry Frederichs, called Wanderon and offered to sell Wanderon 5,000 shares of AYSL at 6⅞. Wanderon called TDA and was told that TDA would repurchase this stock from Wanderon at $7 per share (Compl. ¶17). Thus, TDA was agreeing to repurchase the very shares it had just sold. But TDA was financially unable to go forward with the repurchase and Barad is alleged to have known that (Compl. ¶35). It is alleged that, with the connivance of Barad and Frederichs, similar round-robin transactions occurred through the three other interpositioned stock broker-defendants, Equivest, Friedman & Co., and Letters, Peremel and ·Rashbaum Inc. (Compl. ¶17) and that the nature of the transactions was not disclosed to American or Wanderon (Compl. ¶37). All the parties concerned confirmed the transactions as principals. Frederichs is alleged to have arranged all the transactions, and Barad and Frederichs were alleged to have obtained or been promised some emolument for their activities (Compl. ¶42).

On August 24 and 25, the four selling brokers delivered the AYSL stock, all in negotiable form, to American which received it and paid out $165,625, including $34,375 to Barad and $55,375 to Equivest (Compl. ¶¶ 20–23). This sum was now owed by Wanderon. As security for the advance, American held the 24,000 shares of AYSL received from the various brokers. Pursuant to Wanderon's direction, American tendered the stock to TDA via a Hempstead bank against payment of the amounts which TDA had agreed to pay Wanderon as reflected in the confirmation issued to Wanderon by TDA. TDA failed to pay and American was left holding the stock (Compl. ¶24). Wanderon and TDA are both insolvent. Each has been enjoined from the further transaction of business by court orders made in actions commenced by the SEC (Compl. ¶25). The AYSL stock itself is alleged to have little or no value (Compl. ¶26). American has sought rescission which has been refused.

Based on the foregoing facts, the complaint purports to set forth five causes of action: (1) for rescission and damages under the Securities Act of 1933 arising from the sale of unregistered securities in violation of Section 5; this claim is asserted against all the defendants; (2) for damages for fraud under Sections 12 and 17 of the Securities Act and Section 10(b) of the Securities Exchange Act (and Rule 10b–5) against Barad and Frederichs; (3) for damages for similar fraud against Equivest and the other two delivering brokers; (4) for damages for violation of Section 15 (c) of the Securities Exchange Act against all defendants except AYSL; (5) for common law fraud and violations of the New York State General Business Law against Barad, Frederichs and AYSL.

The first claim for relief, by which American seeks to recover the money it paid out to each of the moving defendants for the AYSL shares, is based on the registration requirements of the Securities Act of 1933. Section 5(a) of

that Act (15 U.S.C. § 77e(a)) makes it unlawful to use the means of interstate commerce to sell or deliver any security unless a registration statement has been filed as to such security. It is alleged that the AYSL stock was sold and delivered without an effective registration statement.[1] Section 12(1) of the Act (15 U.S.C. § 77l(1)) makes a seller of a security in interstate commerce in violation of Section 5, the registration section, "liable to the person purchasing such security from him." [2]

On this motion to dismiss we must treat the allegations of the complaint as true. On that basis we assume that the stock delivered to American by the moving defendants was stock sold without a proper registration statement and with no valid exemption under the 1933 Act. The defendants, however, contend that American has no standing to assert liability against them under Section 12 because American was not "a person purchasing a security from him," i. e., from the moving defendants. The defendants read the statute restrictively to support a claim only by a purchaser in direct privity with the seller. They contend that their purchaser was Wanderon and no other; that American, the bank, was a lender to Wanderon and not a participant in a purchase transaction with the selling defendants. We have been cited to no case under Section 12 of the 1933 Act which has passed on the question of whether a bank which acquires stock at the direction of its customer, for the customer's account, has "purchased" the stock *from* the seller.[3]

American contends that it is a "purchaser" within the meaning of Section 12, because it actually received and paid for the stock, and, when Wanderon failed to repay American's advance, it became as much the purchaser of the stock as if it had acquired the stock directly from Barad and Equivest.[4]

In essence, the proposition is that a bank which purchases stock for a customer who subsequently defaults, can sue the seller just as his customer would have been able to do, if the securities sold turn out to have been sold without registration.

The authorities, as affecting the precise point, are unclear. The Eighth Circuit in Greater Iowa Corporation v. McLendon, 378 F.2d 783, 790 (1967) said: "We do not believe that the statute [the 1933 Act] was designed for the protection of those who are not investors or do not have any semblance of legal privity with the party dealing in the unregistered or fraudulently sold security." Accordingly, the remedies of Section 12 were held unavailable in that case to plaintiffs who had not bought any secur-

---

1. The plaintiff argues that the defendants Barad and Equivest are both "underwriters" and "dealers" as defined in Sections 2(11) and 2(12) (15 U.S.C. §§ 77b(11), (12)) and hence not subject to any exemption under Section 4 (15 U.S.C. § 77d). The moving papers make no point of any exemption and we assume, only for purposes of this motion, that there was none.

2. In subsection 12(2), the seller is also made liable if he makes an "oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading . . . to the person purchasing such security from him . . . ."

3. Various courts have used general language to paraphrase Section 12 but none

of them was concerned with the issue at bar. See Surowitz v. Hilton Hotels Corp., 342 F.2d 596, 603 (7 Cir. 1965), rev'd on other grounds, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966) ; Woodward v. Wright, 266 F.2d 108, 111 (10 Cir. 1959) ; Slavin v. Germantown Fire Ins. Co., 174 F.2d 799, 807 (3 Cir. 1949) ; Rosenblatt v. Omega Equities Corp., 50 F.R.D. 61, 63 (S.D.N.Y.1970) ; Schoenbaum v. Firstbrook, 268 F.Supp. 385, 396 (S.D.N.Y.1967), aff'd, 405 F.2d 200, rev'd en banc on other grounds, 405 F.2d 215 (2 Cir. 1968), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

4. In the case of Barad, it is further suggested that it knew American would have to be the purchaser since it knew that TDA would be unable to pay for the stock.

ities themselves but who were complaining that securities sold to others, with whom the plaintiffs had no connection, were sold in violation of the registration provisions of the 1933 Act. That case did not establish that technical privity of contract is required under Section 12 of the 1933 Act; it merely excluded from the benefits of Section 12 those persons who had no relation to the transaction. The case left the precise meaning of "purchased from him" undecided.

One who buys for another may be a "purchaser" under § 10(b) of the 1934 Act, at least for purposes of suit against his own customers if they fail to reimburse him. A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2 Cir. 1967). Granted that a broker or a bank, acting for a customer, may be a "purchaser" under the securities laws, the question still remains here whether American is a purchaser "from him," *i. e.,* from the seller of the security lacking registration.

Technically it may be argued that the circumstance of default by Wanderon converted American into an involuntary purchaser *from* the moving defendants. Cf. Vine v. Beneficial Finance Co., 374 F.2d 627, 635 (2 Cir. 1967), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1968). But the question of statutory construction affecting the securities laws should not be approached as if the question were soluble by reference to the law of sales. Dasho v. Susquehanna Corp., 380 F.2d 262, 266 (7 Cir.), cert. denied, Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967). It is the purpose of the legislation that must be sought. " '[A] court's quest must be for what will best accomplish the purposes of the legislature.' Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 946 (2d Cir. 1969)." Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 798 (2 Cir. 1969), cert.

denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed. 2d 50 (1970).

In that quest, two legislative purposes may be thought to emerge. The first is that the intention was to create a statutory right in the nature of an expanded common law of deceit, and that, hence, only the person upon whom the deceit was practiced may sue. The other is that the granting of a private right of action was for the purpose of discouraging violations of the registration requirements of the 1933 Securities Act; and that the reason for limiting recovery to those who "purchased from" the seller was merely to limit the vast liability that would otherwise accrue if the remedy were permitted to be invoked by purchasers after the original transaction was over. Although the matter is not without difficulty in the absence of a statement of legislative intention, I incline to the view that the purpose of affording a private remedy by statute was primarily to discourage the sale of securities without registration.[5]

On any other view, the almost absolute liability imposed for a violation of Section 5 would be defeated by the fortuitous circumstance that the customer became unable to pay, even though someone else did pay and even though the seller pocketed the illegal proceeds. In upholding liability in such case, the standing required of a plaintiff for an action under Section 12 is still not expanded beyond those involved in the first purchase.

Moreover, accepting the allegations of the complaint as true for purposes of this motion, the moving defendants and the plaintiff bank do not stand on the same footing. The former are charged with serious securities violations; the latter is not. In these circumstances, the remedial purposes of the statute are best carried out by permitting the Bank

---

5. As one of the early contemporary commentators on the Securities Act of 1933 put it: "Civil liability is imposed partly for the purpose of compensating investors, partly, *and probably more,* for the purpose of compelling compliance with the Act so as to avoid certain types of losses and the need of compensation." Shulman, Civil Liability and the Securities Act, 43 Yale L.J. 227, 253 (1933) (emphasis added).

here to stand in the shoes of its defaulting customer. Accordingly, the motion by Barad and Equivest to dismiss count 1 of the complaint is denied.[6]

The third cause of action against Equivest charges a violation of Sections 12[7] and 17 of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, including acts which if performed with respect to securities traded on a national securities exchange would have violated Section 9 of the 1934 Act.[8] Similar charges are made against Barad in the second cause of action.

Since fraud is charged we must look to see whether the circumstances constituting fraud are alleged with sufficient particularity (Fed.R.Civ.P. 9(b)). The essence of the fraud by Equivest is stated in ¶37 of the complaint:

"37. Defendants Friedman, Equivest and Letters failed to disclose to American and, upon information and belief, failed to disclose to Wanderon, the fact that the securities each of them was selling to Wanderon had that day been purchased from TDA, that the transactions had been arranged by others, that each of them merely was acting as a conduit for transfer of the securities, that each of them while purportedly acting and confirming as principal was, in fact, a mere agent or conduit and that the transactions involved matching purchase and sale orders."

The gist of the complaint is that if American had been told that TDA was, in effect, buying from itself, the transaction would have merited investigation before the shares were taken in and paid for. Accordingly, the plaintiff could "have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact." List v. Fashion Park, Inc., 340 F.2d 457, 463 (2 Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

■ Since, as already established, American is a purchaser, it clearly has standing to bring an action under Section 17(a) of the 1933 Act and Section 10(b) of the 1934 Act since no privity is required for such actions. Superintendent of Ins. v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed. 2d 128 (1971).

In Franklin National Bank v. L. B. Meadows & Co., 318 F.Supp. 1339 (E.D. N.Y.1970), Judge Weinstein held that a bank taking stock as collateral based on false information in the "pink sheets" had standing to sue the brokers perpetrating the fraud who had created a false market in the stock, even though there was no privity between plaintiff and defendants.

■ The difficulty here is that the allegations of fraudulent misstatement or omissions are insufficient to make out a claim for relief against Equivest. It is not alleged that Equivest knew or had reason to believe that TDA was to purchase the shares from Wanderon. There is no claim that Equivest knew of or knowingly participated in a round-robin in which TDA was buying its own shares from itself through known conduits. Nor is there any claim that Equivest, even if they knew these facts, knew them to be material. All that is alleged is a single transaction in which a broker-dealer was told where he could buy from one dealer and sell to another with a small spread in the price, and this is not on its face fraudulent.

■ On the contrary, in the second count it is charged that Barad knew or should have known that the securities being purchased by Wanderon for delivery to TDA were, in fact, the same securities

---

6. It should be noted that the Court is not deciding whether the AYSL shares in issue here were unlawfully sold without registration, nor, more particularly, whether the Regulation A exemption was in effect; nor whether the defendants were underwriters or dealers; nor whether they have other defenses. All these matters involve questions of fact.

7. Presumably § 12(2) is meant.

8. Section 9 is the section prohibiting "manipulation of security prices" (15 U.S.C. § 78i).

which TDA was on the same day selling and that TDA was insolvent (Compl. ¶ 35), and it is further charged that Barad failed to disclose this to Wanderon (Compl. ¶36). Such activity would be prima facie manipulation under Section 9 of the 1934 Act if listed securities were involved. See Thornton v. SEC, 171 F.2d 702 (2 Cir. 1948). The anti-fraud provisions, covering over-the-counter transactions, prohibit sales without disclosure of relevant market activity, which would obviously include such manipulation. *Cf.* Chasins v. Smith, Barney & Co., 438 F.2d 1167 (2 Cir. 1970).

American ended up by being hurt instead of Wanderon. But the injury was caused by the alleged manipulation. Since the bank had the right to rely on the legitimacy of the transaction, it does not matter that the bullet may have been intended for Wanderon and instead hit the bank. There is proximate cause for the injury in the activities of the defendant Barad if it did the things it is alleged to have done. Thus, the causation requirements under the anti-fraud sections of the securities acts are sufficiently met. See Globus v. Law Research Service, Inc., 418 F.2d 1276, 1291–92 (2 Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970).

Accordingly, the motion to dismiss the third count by Equivest is granted. See Shemtob v. Shearson, Hammill & Co., 448 F.2d 442 (2 Cir. 1971). The similar motion by Barad to dismiss the second count is denied.[9]

Count four charges the defendants with the same kind of fraud violations under Section 15(c) of the 1934 Act (15 U.S.C. § 78*o*(c)) prohibiting, *inter alia,* the use of the mails or other instrumentality of interstate commerce for the sale of a security over the counter "in connection with which such broker or dealer engages in any fraudulent, deceptive, or manipulative act or practice, or makes any fictitious quotation." For the same reasons the motion of Equivest to dismiss count four is granted, while that of Barad is denied.

The fifth and final count alleges, on the basis of the same facts, violations of New York's common law of fraud and its General Business Law by Barad, Frederichs and AYSL. And on the basis of this allegation, the plaintiff asks not only for compensatory damages, but also for punitive damages in the amount of one million dollars.

■ Against this count Barad makes a threefold attack. First, Barad argues that American fails to state a claim of common law fraud against Barad. However, most of the supporting arguments that Barad puts forward here must fall with its motion to dismiss count two. While it is true "that all the elements of common law fraud need not be present to establish a violation of" the securities laws, SEC v. American Beryllium & Oil Corp., 303 F.Supp. 912 (S.D.N.Y.1969), and that to sustain a common law count virtually compels sustaining a securities law count, Fry v. Schumaker, 83 F.Supp. 476, 478 (E.D.Pa.1947), the converse is not necessarily true. But Barad's only suggestion of a missing element in the allegation of common law fraud is reliance. In the discussion of count two we found a sufficient allegation of reliance to satisfy the standards of List v. Fashion Park, Inc., *supra.* While the *proof* of reliance to justify recovery for common law fraud might require more than the proof under the securities laws (see 6 L.Loss, Securities Regulation 3878 (1969)), we are not dealing with proof. The *allegation* of reliance here is sufficient for both counts two and five.

■ Second, Barad claims that there is no civil cause of action for damages under Section 352-c of the New York General Business Law (McKinney's Consol.Laws, c. 20, 1968), the section which the plaintiff relies upon and which makes "illegal" certain specified practices concerning securities. But the New York courts do imply a civil cause of action

---

9. Barard may, of course, seek summary judgment after discovery if its denials of knowledge are true.

from a statute which endeavors "to protect the public" and where the only liability expressed in the statute is that of a criminal offense. Atkin v. Hill, Darlington and Grimm, 15 App.Div.2d 362, 224 N.Y.S.2d 553 (1962), aff'd, 12 N.Y.2d 940, 238 N.Y.S.2d 516 (1963). And that has been prophesied as the likely New York result in the application of this very Section (General Business Law § 352–c). Lupardo v. I. N. M. Industries Corp., 36 F.R.D. 438 (S.D. N.Y.1965).

Third, Barad argues that the plaintiff's demand for punitive damages in the common law count is improper in an action such as this, which is based in part on the federal securities law. The defendant apparently concedes that, under New York law, punitive damages can be awarded in a fraud case "where the fraud, aimed at the public generally, is gross and involves high moral culpability." Walker v. Sheldon, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 179 N.E.2d 497, 499 (1961). The plaintiff American alleges fraud in terms of this formula and, *if proven,* the complaint would, on its face, seem to justify an award of punitive damages.

However, the simplicity of this analysis is affected by the existence of Section 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a), which reads in part:

> " . . . no person permitted to maintain a suit for damages under the provisions of this [1934 Act] shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of."

This section has been interpreted to bar punitive damages in actions under Section 10(b) of the 1934 Act. Green v. Wolf Corp., 406 F.2d 291 (2 Cir. 1968), cert. denied, Troster, Singer & Co. v. Green, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). More significantly, this prohibition has been interpreted to extend to actions under Section 17(a) of the 1933 Act. Globus v. Law Research Service, Inc., 418 F.2d 1276 (2 Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). That decision was based, in part, on a desire, in the language of Judge Kaufman, not to "create an unfortunate dichotomy between the 1933 and 1934 Acts," *i. e.,* "an unreasoned split between buyers and sellers of securities subjected to fraud of an equally heinous nature" (418 F.2d at 1286). The Court in *Globus* expressly left open the issue of punitive damages in a common law fraud count joined to a federal securities case (418 F.2d at 1286 n. 11).

It is a difficult question whether the reasoning of *Globus* logically leads to a prohibition of punitive damages in this situation or whether § 28(a), as a statute in derogation of the common law, should be narrowly construed; or even whether the state rule of damages should, in any event, be applied in this case where the jurisdiction is pendent to an alleged federal securities violation.

However, it is not yet clear that this issue need be reached. Upon trial it may very well develop that even under New York law the plaintiff would not be entitled to punitive damages. At any rate, the defendant Barad has moved to dismiss the complaint, not to strike the prayer for punitive damages; the issue concerning such damages is raised only in its brief. Accordingly, decision on this issue is left for the trial judge.

To summarize, the motion to dismiss the third and fourth counts as to Equivest is granted. The motions by Barad and Equivest are in all other respects denied.

So ordered.