Samuel C. Coleman, J.
Four depositors of a bank join in an action against the bank to recover damages at common law and under section 12 of the Securities Act of 1933, as a result of a purchase by the plaintiffs, through the bank, of newly-issued securities. The four plaintiffs were friends and family relations, and one of them, Hyman, presumed to act for all four. The bank is ready to accept his acting for them, although thereby the position of the other three plaintiffs is probably improved.
The plaintiffs desired to subscribe to a new issue of shares of American Book-Stratford Press, Inc. They asked the bank, as agent, to purchase shares for them when those shares should be issued. The bank did so; the plaintiffs declined to accept the transaction, and they have brought this action to recover damages because, they assert the bank failed to follow their instructions to cancel their subscriptions; and also to rescind under the provisions of the Securities Act.
A detailed chronological statement follows:
The plaintiffs had informed the bank that they were interested in purchasing shares in the Stratford Press, the issuance of which was the subject of a registration statement then before the Securities and Exchange Commission. They did so in a document signed by each one, directed to the bank and directing it to “ subscribe at issue price ” “ [300] shares American BookStratford Press.” “It is understood that you assume no liability in complying or failing to comply with this request or *104 for the price at which the above, or any part hereof, is so executed.”
On January 4, 1962, the bank wrote to each of the plaintiffs: “ Referring to your instructions of 1/3/62, we will enter your subscription to [300 shares Stratford Press] at Issue Price subject to our right, if the securities allotted to us are less than the subscriptions received, to cancel your subscription or allocate such securities in our absolute discretion.” The total amount of subscriptions for all four plaintiffs was 800 shares ; the bank was not to receive any compensation for its services, and the complaint alleges that the bank 1‘ agreed to act as agent for the plaintiffs and others to enter with the underwriter’s subscriptions to purchase ” these shares.
The registration statement was approved and became effective on March 6. That day, a representative of Gregory & Sons, dealers and one of the underwriters of the offering, inquired of the bank whether it was interested in the purchase of any shares. The bank informed Gregory that it was, it asked for 800 shares, the shares were sold to the bank that day, and on that day Gregory sent the bank a note of the transaction, an invoice, and a copy of the prospectus that had been filed with the Securities and Exchange Commission.
On March 7, the bank notified each of the plaintiffs (in separate documents) that the respective purchases, in the desired amounts, had been madeAs agent we confirm purchase for your account 300 shares American Book-Stratford, price 15 net, final total $4500.” [Hyman]
But on the morning of March 7, and probably while the confirmations of sales to the plaintiffs were in course of preparation and mailing, plaintiff Hyman informed the bank that he had had a change of heart with respect to the purchase, that information given to him that morning by a broker friend led bim to doubt the advisability of the purchase, and, in the language of the complaint, he asked the bank ‘ ‘ to cancel the subscription of each of the plaintiffs.” He was told that it was too late, that the purchase had been made pursuant to his instructions, the bank was obligated to Gregory, and that nothing could be done. He attempted to persuade one official or the other of the bank to intervene, but to no avail. A copy of the prospectus was not offered to him, he did not ask for one, and it has not been shown whether the change of mind was induced by a prospectus that he had already earlier seen or been told about by his broker friend.
On the same day, March 7 (whether before or after Hyman’s efforts to cancel does not appear), Hyman and his daughter, *105 also a plaintiff, wrote the bank instructing it to deliver their respective shares when received by the bank, to their brokers, “to my account free.” And on March 8, the plaintiffs, who did not have sufficient funds in their respective accounts with the bank to pay for the shares, arranged to have additional funds deposited and paid the bank for the securities. The securities were received by the bank on March 14. Those of Hyman and of his daughter were immediately delivered, as had been requested, to their brokerage firm, and on March 30 the other two plaintiffs called for and received the securities at the bank.
On May 18, Hyman, in behalf of all four plaintiffs, demanded ‘ ‘ rescission of the transaction with respect to 800 shares of American Book-Stratford Press, Inc., and offered to restore to you the certificates which have been issued to us in connection therewith. ’ ’
The first cause of action against the bank [the third in the complaint; the first two causes of action against Gregory, the underwriter, have been dismissed on motion for summary judgment] is based upon the bank’s breach of duty as agent of the plaintiffs, ‘ ‘ by failing and refusing to instruct the underwriters of said issue, including Gregory & Sons, to cancel the subscriptions of the plaintiffs which had been previously entered ”.
I think the plaintiffs are on weak ground. The transaction between the bank and Gregory was consummated on the 6th. Gregory was required to make delivery and the bank was obliged to accept and to pay for the 800 shares, so that when Hyman requested the bank to ‘ ‘ cancel the subscriptions ’ ’, the position of the bank had already changed: there were no subscriptions to cancel; the bank could not cancel. The bank had bought the shares only as agent for the plaintiffs, and the instructions to cancel came too late.
If the bank’s position was changed, then we are not at all concerned with whether it should, in its own interest vis-a-vis underwriters or in the interest of its depositors, have attempted to undo what had already been done. The “ undoing ” would have been a matter of accommodation between the bank and the underwriters, and nothing more. One of the witnesses for the plaintiff testified that it — “ undoing ” — could not have been effected, and another that he “ would see ” if the underwriter would cancel. The plaintiffs complain that the bank acted ‘ ‘ in bad faith ” in ‘ ‘ refusing to enter such cancellations”. This may mean that the bank acted in “ bad faith ” in refusing to attempt to cancel, which is the most it could have done. But *106 there was no “bad faith ”, and this without reference to the instrument under which the bank was acting and under which it assumed “ no liability in complying or failing to comply with this request” (cf. Gaita v. Windsor Bank, 251 N. Y. 152; Pyramid Musical Corp. v. Floral Park Bank, 268 App. Div. 783).
In their complaint, in the cause of action against Gregory, the plaintiffs say that “on or about March 7, 1962 [Gregory], sold to the plaintiffs an aggregate of 800 shares ’ ’ and in the complaint against the bank that the bank “ agreed to act as agent ” in entering the subscriptions. Nowhere do the plaintiffs, in their complaint or in their briefs, say that as a matter of contract the oral agreement between the bank and Gregory was not binding. They allege a sale on the 7th (the sale was on the 6th); they apparently recognize that the agreement, in normal course, commits the bank, notwithstanding the absence of a writing (cf. Restatement, Agency 2d, § 385, Comment /; § 418, Comment a). Their complaint, I repeat, is either that the bank did not cancel, or that it did not attempt to cancel; not that there was no agreement between bank and Gregory.
Moreover, I think that the plaintiffs have unequivocally ratified the purchase of the securities in their behalf. The chronology of events is against them. After their original protest against the bank’s purchase and the bank’s refusal “ to effect cancellation ’ ’, or to attempt to bring it about, they procured funds with which to pay for the shares, paid for them, gave instructions for their delivery, called for them and accepted them. It was not until two months had elapsed, during which the shares had declined from $15 to $7.50 a share, that they attempted to repudiate. It may be that procuring funds for the payment of the stock, so as not to be overdrawn, by itself is not an act of ratification; but the chain of events indicates that the plaintiffs were ready to accept the shares and that they accepted the transaction as an accomplished fact. Their retention of the shares for two months manifests that they were gambling upon the vicissitudes of the market. In such circumstances, it seems to me that it is too late for them to complain of the bank’s alleged breach of duty — failure to comply with their request.
There are two other causes of action against the bank (fourth and fifth in the complaint). The fourth is this: “That in allocating to itself the function of distributing for the issuer and for the underwriters of the issue of [the] shares [the bank] participated in the direct or indirect underwriting of the issue and engaged directly or indirectly as agent, broker or principal in the offering, buying, selling and otherwise dealing or trading *107 in [those securities] and constituted itself an underwriter and/or dealer in the said issue ”, and that the bank used the mails for the purpose of delivering the shares of stock without an accompanying copy of the prospectus which had been approved by the Securities and Exchange Commission. The bank’s conduct in this respect, the plaintiffs say, was in violation of section 12 of the Securities Act of 1933 (U. S. Code, tit. 15, § 771).
The fifth cause of action is to the effect that the documents sent through the mails by the bank, relating to the transaction, constituted a prospectus; and that this prospectus did not meet the requirements of section 10 of the Securities Act of 1933 (U. S. Code, tit. 15, § 77j).
Both causes of action allege an attempted rescission on May 18,1962, and ask for the recovery of the amount of the purchase price, under subdivision (1) of section 12 of the Securities Act of 1933.
Neither cause of action is valid. I do not think that section 12 is applicable in any way. It subjects to liability “ any person who — (1) offers or sells a security in violation of section 5 ”, but there has been no violation of paragraph (1) of subdivision (b) of section 5 or paragraph (2) of subdivision (b) of section 5. These two sections make it unlawful — “ (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed under this title, unless such prospectus meets the requirements of section 10; or (2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 10.”
There is no suggestion that there was any violation of subdivision (2) of section 12 relating to untrue statements of material fact in a prospectus or in any oral communication. But whether or not the mails were used in transmitting the securities; whether or not ‘' any means or instruments of transportation or communication in interstate commerce ’ ’ were used for the purpose of transmitting a prospectus, or whether any prospectus at all was sent by the bank or offered to the plaintiff, we must look to section 4 to determine whether the provisions of section 5 apply.
But first, it should be noted that the bank was neither offering to buy shares for the plaintiffs nor offering to sell them to them. *108 There was no solicitation by the bank in any manner. It was buying for the customers at the request of the customers as a matter of accommodation to them and without any compensation to it. At most, it was acting only as a broker, and the transactions of brokers (unless solicited by brokers) are excluded from the scope of subdivision (b) of section 5.
■Section 4 reads in part: “ The provisions of section 5 shall not apply to any of the following transactions: * * * (2)
Brokers’ transactions, executed upon customers’ orders on any exchange or in the open or counter market, but not the solicitation of such orders ” (cf. Murphy v. Cady, 30 F. Supp. 466, 469, 470, affd. 113 F. 2d 988; Boehm v. Granger, 181 Misc. 680, affd. 268 App. Div. 855). And “the prospectus requirements of the Act do not apply to unsolicited brokers’ transactions, whether executed on an exchange or over the counter ’ ’ (Securities and Exch. Comm., July 25, 1941, 11 Fed. Beg. 10964).
Subdivision (1) of section 4 makes section 5 inapplicable to “ Transactions by any person other than an issuer, underwriter or dealer ’ ’. It is difficult to see how the bank can be said to be either an issuer or an underwriter or a dealer. The plaintiffs do say — I repeat — that the bank is “an underwriter and/or dealer”. They limit themselves in their briefs to the contention that the bank was an “ underwriter ”. But a reading of the section dealing with definition of terms (§ 2, subds. [11], [12]) disposes of plaintiffs’ contention in this respect:
“ (11) The term ‘ underwriter ’ means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and1 customary distributors’ or sellers’ commission. As used in this paragraph the term ‘ issuer ’ shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.
“ (12) The term ‘ dealer ’ means any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person.”
*109 Again, the participation of the bank in the entire transaction was tangential — that of an uncompensated, unsoliciting broker acting as an accommodation for its depositors in the purchase of securities.' The bank might not have been able to obtain the full amount subscribed for in behalf of the plaintiffs and, if so, it wished to be free to deal with them as it saw fit. The power of allocation in no way changed the relation of the bank to the customers or enlarged the nature of the banks “participation” in the issuance of the new stock. In no way was it co-operating with the underwriter or participating in the matter of distribution; it merely took from an underwriter what the latter was prepared to sell — here all the bank had asked for. As in the case of an ordinary broker the bank, acting for principals, made an offer to an underwriter to purchase a certain number of shares. The offer might be accepted, or a counter proposal to deliver less might be made. Only in the latter case would the bank be called upon to consider its position. Not so here. And, assuming the bank was in other respects an underwriter, those underwriters “whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors’ or sellers’ commission,” are excluded from the definition by the same section. The bank was receiving compensation from nobody; nor was the b'ank engaged in “ public distribution ” of the stock on behalf of anyone (cf. Securities and Exch. Comm. v. Guild Films Co., 178 F. Supp. 418, affd. 279 F. 2d 485). So far as the chain of distribution is concerned the banker was in the position of the consumer.
Nor, to revert to the expression “ underwriter and/or dealer ” in the complaint, is the bank a dealer within the definition of subdivision 12. “ The characteristic activities of a dealer in
securities are similar to those of a dealer or jobber in merchandise. The dealer sells securities to his customer which he has purchased or intends to purchase elsewhere or buys securities from his customer with a view to disposing of them elsewhere. In any such transaction he acts for his own account and not as agent for the customer. He receives no brokerage commission but relies for his compensation upon a favorable difference or spread between the price at which he buys and the amount for which he sells. The risk of loss is entirely his own.” (1936 Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker, Securities and Exch. Comm., p. XIV.) One, then may be a “dealer” when acting for his own profit, irrespective of the nominal capacity in which he acts. In Stadia Oil & Uranium Co. v. *110 Wheelis (251 F. 2d 269, 275) for example, one of the defendants, “ Smith, at the very least engaged directly as agent or broker in the business of selling and dealing in securities issued by Stadia [the issuer] and was a ‘ dealer ’ within the definition of that term in section 77 (b) (12) He acted as a distributor for the issuer under the guise of selling shares as his own.
The bank’s activities here were even less closely identified with the transaction than that of a conventional broker, by virtue of the fact that it was acting merely as an uncompensated agent. And as section 12 applies only to one who offers or sells a security, the bank neither offered nor sold any security except in the most formalistic sense. To be sure, the purchases were made by it from Gregory in its own name and by so doing the bank obligated itself. But the bank by law could not purchase the securities for itself (U. S. Code, tit. 12, §§ 24, 335), and that fact was as well known to the plaintiff as the plaintiff says it was known to Gregory. In their argument to the court on the motion of Gregory for summary judgment, the plaintiffs stated, “the Bank could not lawfully have purchased the 800 shares for its own account” (citing New York Banking Law, § 97); and again, “thus, as Gregory & Sons well knew, the Bank could not have purchased [the] stock for its own account, and must have been acting for third parties.” With this premise, it is impossible to see how section 12 has any application to the case.
After the exchange of briefs, I raised the question whether conventional rules of waiver and ratification would apply to an action based upon section 12 of the Securities Act and I received additional briefs on the point (cf. Royal Air Props. v. Smith, 312 F. 2d 210; Straley v. Universal Uranium & Milling Corp., 289 F. 2d 370, 312 F. 2d 745; Dale v. Rosenfeld, 229 F. 2d 855). But as the provisions of the Securities Act do not apply to the transaction here, it is unnecessary to decide that question. The complaint is dismissed.