599 F.2d 1111
 Fed. Sec. L. Rep. P 96,761
Mauricio ADATO and Ana and Samuel Cikrovich, Plaintiffs-Appellants,
and
All persons listed on Schedules A, B and C attached to
Amended Complaint, Plaintiffs-Intervenors-Appellants,
v.
Saul KAGAN, Abraham Feinberg, Leslie Geiger, Stanley
Kreitman, Jose Klein, Alexander Szasz, Arthur Vare, Martin
Wolf, Francisco Klein, Thomas J. Klutznick, Torleaf H.
Benestad, Jean L. Wolf, Fabio Bohorquez, Robert Migatz,
Edmund A. Fleckenstein, Juan Graiver, Enrique Brodsky,
Continental Trade Bank, American B & T Corporation and Lydia
Graiver, as Administratrix of the Estate of David Graiver,
Defendants-Appellants.
 No. 772, Docket 77-7620.
 United States Court of Appeals,
Second Circuit.
 Argued April 7, 1978.
Finally Submitted June 18, 1978.
Decided Jan. 29, 1979.
 
 Stephen Lowey, New York City (Lipper, Lowey & Dannenberg and Burton L. Knapp, New York City, Richard B. Dannenberg, New York City, of counsel), for plaintiffs-appellants.
 Peter H. Morrison, New York City (Morrison, Paul & Beiley, New York City, Benjamin Zelermyer, Gerald G. Paul and Bobbe A. Brown, New York City, of counsel), for appellee Kagan.
 David C. Birdoff, New York City (Reavis & McGrath, New York City, Stephen R. Steinberg, Andrew C. Freedman and John A. Lowe, New York City, of counsel), for appellee Feinberg.
 Geoffrey D. C. Best, New York City (LeBoeuf, Lamb, Leiby & MacRae, New York City), for appellee Continental Trade Bank.
 Robert Cohen, New York City (Lans, Feinberg & Cohen, New York City), for appellee Migatz.
 Paul, Weiss, Rifkind, Wharton & Garrison, New York City, filed a brief, for appellee Klutznick.
 Lawrence M. Saiewitz, New York City, filed a brief, for appellee Fleckenstein.
 Harvey L. Pitt, Gen. Counsel, James H. Schropp, Asst. Gen. Counsel, Washington, D. C., and Ralph A. Siciliano, Atty., Securities and Exchange Commission, New York City, filed a brief, for the SEC, amicus curiae.
 Reford J. Wedel, Acting Gen. Counsel, Werner Goldman, Counsel, Arthur L. Beamon, Senior Atty. and Linda G. Davenport, Federal Deposit Ins. Corp., Washington, D. C., filed a brief, for the FDIC, amicus curiae.
 Before WATERMAN, TIMBERS and VAN GRAAFEILAND, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 Fifty-nine foreign nationals appeal from orders of the United States District Court for the Southern District of New York dismissing their complaint against appellees under Federal Rule of Civil Procedure 12(b)(6) for failure to state claims under either the federal securities laws or banking laws.[1] We reverse as to all claims except those predicated upon alleged violations of section 11(m) of the Federal Reserve Act, 12 U.S.C. § 248(m).
 
 
 2
 The issues confronting the district court were novel and require a somewhat detailed review of the allegations in the complaint, which, for purposes of this opinion, are assumed to be true. Jenkins v. McKeithen, 395 U.S. 411, 421-22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969).
 
 THE FACTUAL ALLEGATIONS
 
 3
 Until September 15, 1976, American Bank & Trust Co. (ABT) was a New York chartered commercial bank and a member of the Federal Reserve System. Its deposits were insured by the Federal Deposit Insurance Corporation. All of ABT's outstanding capital stock was owned by the defendant American B & T Corp. (ABT Corp.) and constituted almost all of the assets of that corporation. Approximately seventy-six percent of ABT Corp.'s stock was held by defendant Continental Trade Bank, a Swiss banking corporation, and an additional nine percent was owned by nine of the individual defendants, each of whom was an officer of ABT.
 
 
 4
 On November 25, 1975, defendant Juan Graiver agreed to buy the stock owned by Continental and the nine individual defendants for $32,604,000, which was almost double the stock's book value. Only $9,100,000 of this amount was paid in cash; the balance was to be paid over a five-year period. Two months prior to the execution of this agreement, state and federal regulatory authorities had warned ABT that it was in hazardous financial condition due to its large proportion of high-risk loans and the lack of supervision by directors and senior management. The New York Superintendent of Banks had issued a cease and desist order directing ABT to remedy this condition and to discontinue certain unsafe and unauthorized practices. Appellants allege that Continental and the nine individual defendants, knowing of ABT's shaky financial condition and the exorbitant price paid by Graiver, were put on notice that improper financial machinations involving ABT were in the offing.
 
 
 5
 Such machinations did take place. Pending approval by the New York Superintendent of Banks of Juan Graiver's acquisition of ABT Corp. (which was never given), Continental was authorized by the purchase agreement to nominate three representatives to the board of ABT Corp. Graiver was authorized to nominate the remaining members and given voting control of the stock. Juan's son, David,[2] was elected first to the board of ABT Corp. and then to the board of ABT, Juan succeeding him as director of ABT Corp. Both were provided with offices in the bank, and David was given authority to act as a bank executive officer.
 
 
 6
 In 1974, the Graivers had organized a bank in Brussels, Belgium, known as Banque Pour L'Amerique du Sud (BAS). In 1975, the Graivers had organized a Panamanian corporation known as New Loring, Inc., which was a corporate shell with no assets and no operations. Between September 30, 1975, and May 31, 1976, ABT extended credit in various forms to the Graivers and Graiver-controlled corporations, including the foregoing, in amounts ranging from $10 million to $22.4 million. This was between 43.1% And 88.5% Of ABT's book capital. The proceeds of the loans were funneled back to the Graivers and used to finance their purchase of ABT Corp. Because these extensions of credit resulted in substantial overdrafts and violated federal and state banking laws as well as the cease and desist order of the State Superintendent of Banks, defendants searched for ways to reduce the unfavorable balances in the Graiver-controlled accounts. The plan that evolved was supervised by David Graiver, who had been placed in charge of ABT's International Division, including its Mexican operations.
 
 
 7
 David induced ABT's Mexican representative to conduct a concerted drive for new deposits. Appellants were among those who responded, delivering new funds to ABT as time deposits and renewing existing time deposits; their total financial commitment exceeded $5 million. However, these funds were not entered in ABT's books as time deposits. Instead, they were credited to the accounts of BAS, New Loring, and ABT Corp., with bookkeeping entries showing that the money had been invested in "time deposits" of BAS, "certificates" of New Loring, and "commercial paper" of ABT Corp. ABT gave appellants receipts showing that they were depositors of ABT but followed this up by sending them confirmations of their "investments" in BAS, New Loring, and ABT Corp.
 
 
 8
 On September 15, 1976, ABT was put into receivership by the New York Superintendent of Banks. The FDIC was appointed receiver and arranged for the sale of ABT to Bank Leumi Trust Company of New York, which assumed certain liabilities of ABT, including its time deposits. Appellants were informed thereafter that, because their funds were not represented on ABT's books as deposits, they would not be repaid by Bank Leumi. Appellants could expect little or no payment from the corporations in which their funds had been "invested". New Loring never had any assets; BAS was closed by Belgian authorities on September 1, 1976, and subsequently placed in receivership; ABT Corp. was insolvent and filed in Chapter XI reorganization on December 2, 1976.
 
 
 9
 This unhappy situation led to the present suit for rescission and damages.
 
 THE SECURITIES LAW CLAIMS
 
 10
 Appellants allege that, in recording their deposits in ABT as investments in BAS, New Loring, and ABT Corp., ABT was "in effect" selling them unregistered securities in violation of sections 5(a) and 12(1) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and 77L (1) and that ABT also violated section 12(2), 15 U.S.C. § 77L (2), by making untrue statements of material facts and omitting to state material facts necessary in order to make its statements not misleading. Appellants assert that appellees were "controlling persons" of ABT within the meaning of section 15 of the 1933 Act, 15 U.S.C. § 77O, and had knowledge of or reasonable grounds to believe in the existence of the facts by which the liability of ABT to appellants is alleged to exist. Appellants allege further that ABT violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 by employing artifices and schemes to defraud and by making untrue statements and misleading omissions, and that appellees were controlling persons of ABT under section 20 of the 1934 Act, 15 U.S.C. § 78t.
 
 
 11
 In the same breath, appellants maintain that they were simply depositors of ABT and that ABT misappropriated, misapplied, and converted their deposits without their knowledge or authority by treating the deposits as investments in the securities of BAS, New Loring, and ABT Corp. It was this insistence by appellants that they intended only to make deposits in ABT and not to purchase the securities of other corporations that led to the dismissal of their securities claims. The district court held that the sections of the Securities Act and Securities Exchange Act relied upon by appellants were not intended for the protection of persons "who had no intent to be, or knowledge that they were, investors."
 
 
 12
 We believe that issues were presented which should not have been disposed of by a Rule 12(b)(6) motion. It may be that, had the action proceeded to trial and the evidence established that appellants did not intend to purchase securities of BAS, New Loring, and ABT Corp., did not authorize their purchase, and had no knowledge that ABT was making unauthorized transfers of money and securities, dismissal would have been proper. The statutes upon which appellants rely give them standing only as purchasers of securities. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731-55, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); Superintendent of Insurance v. Bankers Life & Casualty Co., 430 F.2d 355, 359-60 (2d Cir. 1970), Rev'd on other grounds, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Greater Iowa Corp. v. McLendon, 378 F.2d 783, 788-89 (8th Cir. 1967); Surowitz v. Hilton Hotels Corp., 342 F.2d 596, 603 (7th Cir. 1965), Rev'd on other grounds, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966). If the proof showed that appellants had no knowledge of what ABT did or intended to do with their deposited funds, appellants might be hard put to establish their status as purchasers. The securities acts are designed to protect investors "by promoting full disclosure of information thought necessary to informed investment decisions." SEC v. Ralston Purina Co., 346 U.S. 119, 124, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953) (footnote omitted).
 
 
 13
 It is possible, however, that the facts, when fully developed, will not be so clear-cut. Bank depositors may authorize the bank, as agent, to use their deposited funds for designated purposes, including the purchase of stock. See Ehag Eisenbahnwerte Holding Aktiengesellschaft v. Banca Nationala A Romaniei, 306 N.Y. 242, 250-51, 117 N.E.2d 346 (1954); Hyman v. Gregory & Sons, 44 Misc.2d 102, 103, 252 N.Y.S.2d 919 (Sup.Ct.1964). The confirmations of investments in BAS, New Loring, and ABT Corp. that were mailed to appellants furnish some indication, although perhaps not a strong one, that appellants knew how their funds were being used and may have been fraudulently induced to approve of, or at least to accept, what was being done. Appellants have sued the FDIC in state court, and the issues of authorization and ratification may well be litigated in that proceeding.[3] It would be unfortunate indeed if these issues were decided adversely to appellants after the complaint herein had been dismissed.
 
 
 14
 It is "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted). It is not clear at this juncture that plaintiffs cannot present such proof. A ruling on the legal adequacy of their claim should await further development of the facts. We express no opinion as to the merits of appellants' contentions or the ultimate disposition to be made by the district court.
 
 
 15
 With the able assistance of the SEC which filed an amicus brief, appellants argue in this Court, for the first time, that the district court need not have reached the issue of their intent to invest in BAS, New Loring, and ABT Corp. They say that the time deposits of ABT, which they intended to purchase, were themselves securities within the meaning of section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and that appellants were defrauded in connection with their purchase of these "securities". See Garner v. Pearson,374 F.Supp. 591, 596 (M.D.Fla.1974). But see Bellah v. First National Bank,495 F.2d 1109, 1114 (5th Cir. 1974). This claim was not made in the complaint and, so far as we can determine, was not asserted in the district court.[4] Although we are reluctant to pass upon a contention urged for the first time in this Court, Terkildsen v. Waters, 481 F.2d 201, 204 (2d Cir. 1973), where the issue raised involves a possible miscarriage of justice, we are not precluded from considering it. Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). However, because we are reversing and remanding on other grounds, we have concluded that appellants should be given an opportunity to amend their complaint and argue the "security" status of time deposits in the first instance in the district court. See Green v. Brown, 398 F.2d 1006, 1010 (2d Cir. 1968).[5]
 
 THE BANKING LAW CLAIMS
 
 16
 Appellants' first claim under the federal banking laws is based upon alleged violations of section 22(g) of the Federal Reserve Act, 12 U.S.C. § 375a, which limits to $5,000 the amount of credit a member of the Federal Reserve may extend to any of its executive officers. Section 22(f), 12 U.S.C. § 503, provides that any officer who knowingly participates in or assents to a violation of section 22(g) shall be personally liable for all damages "which the member bank, its shareholders, or any other persons shall have sustained in consequence of such violation."
 
 
 17
 Appellants allege that excessive loans were made to the Graivers and Graiver-affiliated corporations and to at least one other executive officer, and that the diversion of appellants' funds to the Graiver-controlled corporations was for the benefit of the Graivers, enabling them to gain control of ABT. Appellants claim that they suffered damage "in consequence of such violation." Again, we are met with problems that are difficult to solve on a Rule 12(b)(6) motion.
 
 
 18
 We can find no case that has considered the question whether an excessive loan to a corporate alter ego of a bank officer for his personal use and benefit violates section 22(g). However, it has been held to be a violation for a bank president to borrow $10,000 from the bank by using the accommodation note of a third party. See FDIC v. Vest, 122 F.2d 765 (6th Cir.), Cert. denied, 314 U.S. 696, 62 S.Ct. 414, 86 L.Ed. 557 (1941).[6] Having in mind the salutary purposes of the statute, we are not prepared to reject out of hand the possibility that ABT officers violated section 22(g). Appellants should be permitted to present their proof.
 
 
 19
 A second obstacle which appellants must surmount, the one that prompted the district court to dismiss, concerns appellants' right to predicate their individual causes of action upon the alleged statutory violation. As a general rule, wrongdoing by bank officers that adversely affects all depositors creates a liability which is an asset of the bank, and only the bank or its receiver may sue for its recovery. Michelsen v. Penney, 10 F.Supp. 537, 539 (S.D.N.Y.1934); 1 Michie, Banks and Banking ch. 3, § 69 at 289-91 (1973); See 12 U.S.C. § 1821(d). Individual depositors may sue in their own right, however, if they have suffered a wrong that is distinctly theirs and not common to all. Harmsen v. Smith, 542 F.2d 496, 500 (9th Cir. 1976); 1 Michie, Supra at 289. We see no reason why this exception to the general rule should not apply to a section 22(g) violation.
 
 
 20
 It can hardly be denied that, as of now, appellants stand in a different position from that of the other depositors. Their right to be treated as depositors has been disputed by both the FDIC and Bank Leumi, and appellants have a suit pending against the FDIC. Under the circumstances, the FDIC is hardly the proper party to represent them in this proceeding. If appellants have a claim, it is not common to those of other depositors whose interests are represented by the FDIC.
 
 
 21
 Finally, appellants are confronted with the task of establishing causal relation between the illegal loans and their own loss. The existence of causal relation may depend perhaps upon whether the misappropriation of appellants' money was an integral part of the allegedly illegal lending or was simply an attempted cover-up for illegal acts that had already been committed. Proving causal relation will not be an easy task. However, "difficulty of proof provides no reason for dismissing the complaint." Harmsen v. Smith, supra, 542 F.2d at 502. Tenuous theories of liability are better assayed in the light of actual facts than in pleader's supposition. Shull v. Pilot Life Insurance Co., 313 F.2d 445, 447 (5th Cir. 1963). We believe that the making of an intelligent decision on this issue requires prior development of the facts. See Egelston v. State University College, 535 F.2d 752, 755 (2d Cir. 1976). We conclude that appellants' claim under section 22(g) should not have been dismissed. In so holding, we do not in any way predetermine the merits of appellants' contentions.
 
 
 22
 Appellants' second claim under the federal banking laws alleges a violation of section 11(m) of the Federal Reserve Act, 12 U.S.C. § 248(m), which prohibits the making of a loan to any person which is in excess of ten percent of the bank's unimpaired capital and surplus. A private right of action for violation of this section is not provided for by statute. However, appellants contend that the district court erred in refusing to imply one. We disagree.
 
 
 23
 Section 11 deals with the powers of the Board of Governors of the Federal Reserve System. Subsection (m) empowers the Board to fix the percentage of member banks' capital and surplus represented by secured loans, but imposes a ten percent ceiling on individual loans as described above. There is nothing to indicate that Congress contemplated a private cause of action against bank officers for exceeding this limitation. Support for this conclusion is found in the failure of Congress to include section 11 among those for the violation of which individual liability is prescribed in section 22(f).
 
 
 24
 A similar ten percent limitation is contained in 12 U.S.C. § 84, and Congress has provided that bank directors may be held personally liable for the knowing violation of this section. 12 U.S.C. § 93. However, sections 84 and 93 are applicable only to national banks. It seems quite clear that, in this area, Congress intended the liability of state bank officials to be determined under state banking laws.[7] Measured by the criteria found significant in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the refusal of the district court to imply a cause of action was correct.
 
 
 25
 As an additional argument in support of his motion to dismiss, appellant Klutznick advances the claim that he resigned as director of ABT in September 1975. This assertion is contained only in his brief. The complaint alleges that he resigned in February 1976. The complaint alleges also that Klutznick was a "controlling person" of ABT within the meaning of section 15 of the Securities Act and section 20 of the Securities Exchange Act. We are not prepared at the present time to treat Klutznick differently from the remaining appellees.
 
 DISPOSITION
 
 26
 That portion of the orders appealed from which dismisses the claims based upon section 11(m) of the Federal Reserve Act is affirmed. As to the remaining claims, the orders are reversed and the matter is remanded to the district court for further proceedings. Costs are awarded to appellants.
 
 
 27
 TIMBERS, Circuit Judge, concurring in part and dissenting in part:
 
 
 28
 Judge Van Graafeiland has written his usual thoughtful, perceptive majority opinion. I agree with it in part and disagree with it in part.
 
 
 29
 With respect to the federal securities laws claims, I agree with the majority's reversal of the district court's dismissal of these claims. I also agree with the majority's remand of these claims to the district court for trial. But I would reverse and remand not on the ground urged by the majority, that appellants should be permitted to prove investor intent and knowledge but on the ground that appellants' complaint sufficiently states claims for relief under Section 12 of the Securities Act of 1933, 15 U.S.C. § 77L (1976), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976), and Rule 10b-5 under the Exchange Act, 17 C.F.R. § 240.10b-5 (1978).
 
 
 30
 With respect to the federal banking law claims, I agree with the majority's affirmance of the district court's dismissal of appellants' claims under Section 11(m) of the Federal Reserve Act, 12 U.S.C. § 248(m) (1976), since there is neither an express nor an implied private right of action for violation of that section of the statute. I respectfully dissent, however, from the majority's reversal of the district court's dismissal of appellants' claims under Sections 22(f) and 22(g)(4) of the Federal Reserve Act, 12 U.S.C. §§ 503 and 375a(4) (1976), since I believe that some causal connection between the loss sustained and the asserted violation must be alleged clearly in the complaint; there not only is no such allegation of causal connection here, but by the very nature of the transaction there could have been no causal connection.
 
 I.
 
 31
 Accepting all of appellants' allegations as true for purposes of evaluating the complaint, they claim nothing more than the typical garden-variety type of fraud. The scheme in which appellants became enmeshed during the period from January to September 1976 was a product of Graiver's attempt to rescue the American Bank & Trust Co. ("ABT") from financial ruin in the face of directives from the Superintendent of Banks of the State of New York. On instructions from Graiver, the Mexican agents of ABT embarked upon a campaign of aggressive solicitation of time deposits. In the course of their solicitations, these agents represented that ABT was in sound financial condition, never disclosing the irregularities for which the bank had been criticized by the regulatory authorities.[1]
 
 
 32
 Induced by these representations, appellants entrusted their funds to agents of ABT upon the understanding that these funds would be placed in time deposits in the bank. Contrary to their understanding, however, the funds were diverted by ABT into various other unregistered, and far riskier, securities, without the prior knowledge or authorization of appellants. Although form-letter "confirmations" of their "investments"[2] subsequently were mailed to appellants, these confirmations contained no information about the performance of the companies in which the funds had been invested or any other information generally considered to be material to a reasonable investor.[3] Moreover, since the confirmations were written in English and many appellants were Mexican nationals who could not read English, the confirmations triggered little response. Those who did inquire about the confirmations were misled by ABT's Mexican agents, who assured them that the investments were ABT deposit obligations.
 
 
 33
 When ABT and the entire Graiver empire collapsed in September 1976, the FDIC informed appellants that, since their funds had been placed in investments other than time deposits, their funds were not insured. Appellants thereupon commenced the instant action in the Southern District of New York on October 5, 1976, alleging, Inter alia, various violations of the federal securities and banking laws. From the judgment of the district court, entered on the court's opinion of November 23, 1977, dismissing these claims in their entirety, and pursuant to a Rule 54(b) certificate, the instant appeal has been taken.
 
 II.
 
 34
 Turning first to the issues raised by the district court's dismissal of appellants' securities laws claims, the court recognized, under the settled law of this Circuit, that in certain instances investors who are "forced" buyers or sellers fall within the class of persons which the securities laws were designed to protect. E.g., Zeller v. Bogue Electric Manufacturing Corp., 476 F.2d 795, 800 (2 Cir.) (Friendly, J.), Rev'g 346 F.Supp. 651 (S.D.N.Y.1972), Cert. denied, 414 U.S. 908 (1973); Vine v. Beneficial Finance Co., 374 F.2d 627, 633-37 (2 Cir.) (Feinberg, J.), Cert. denied, 389 U.S. 970 (1967). Nevertheless, the court dismissed appellants' claims under Section 12 of the 1933 Act[4] and Section 10(b) of the 1934 Act,[5] holding that these sections were not intended to protect "persons who had no intent to be, or knowledge that they were, investors." Adato v. Kagan, (1977-1978 Transfer Binder) Fed.Sec.L.Rep. (CCH) P 96,241 at 92,623 (S.D.N.Y.1977).
 
 
 35
 The majority opinion avoids holding squarely whether this ground upon which the district court dismissed the securities law claims is warranted by the language or purposes of the statutes. The majority simply reverses and remands for trial on the issue of whether appellants had investor knowledge and intent. While I agree with my colleagues in reversing the dismissal of appellants' securities laws claims and in remanding for trial, I would go further and hold that, as a matter of law, appellants are indeed "purchasers" entitled to the protection of the securities laws.
 
 
 36
 It is common ground that one who sues under either Section 12 or Section 10(b) in some fashion must have purchased or sold the security in question. Wolf v. Frank, 477 F.2d 467, 479 (5 Cir.), Cert. denied, 414 U.S. 975 (1973); Schoenbaum v. Firstbrook, 268 F.Supp. 385, 396 (S.D.N.Y.1967), Aff'd, 405 F.2d 200 (2 Cir.), Rev'd en banc on other grounds, 405 F.2d 215 (2 Cir. 1968), Cert. denied, 395 U.S. 906 (1969) (purchase required for action under Section 12). Accord, Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975) (purchase or sale required for action under Section 10(b)). The purpose behind this express requirement of Section 12 is to prevent the impetus for enforcing a private right of action from exposing defendants to vast and often unjustified liability. See American Bank & Trust Co. v. Barad Shaff Securities Corp., 335 F.Supp. 1276, 1280 (S.D.N.Y.1972). A similar purpose underlies the judicially implied purchaser-seller requirement of Section 10(b) and Rule 10b-5. Blue Chip Stamps v. Manor Drug Stores, supra, 421 U.S. at 739-43.
 
 
 37
 In this case, however, that purpose would not be served by expanding the purchaser-seller requirement to add a further requirement of an "intent to invest" on the part of the plaintiff-purchasers. While the Supreme Court has required a showing of scienter on the part of Defendants in an action under Rule 10b-5, Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976), there is no corresponding requirement that a Plaintiff have a particular state of mind when he acquired his "purchase". Indeed, no decision of the Supreme Court or of this Court supports the district court's holding that investment intent is required for standing under these sections of the securities laws.[6] In A. T. Brod & Co. v. Perlow, 375 F.2d 393, 396-97 (2 Cir. 1967) (Kaufman, J.), we held:
 
 
 38
 "Neither § 10(b) nor Rule 10b-5, it appears, speaks in terms of limiting the nature of the violation to one involving fraud of 'investors'; nor is there any justification for reading such an additional requirement into the Act. . . . We cannot understand, therefore, any rationale which would restrict or inhibit appropriate private rights of action to enforce the Rule to those brought by 'investors.' See Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961). . . .
 
 
 39
 . . . We believe that § 10(b) and Rule 10b-5 prohibit All fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws." (emphasis in original).
 
 
 40
 The decision in Blue Chip Stamps, limiting claimants to those who actually have purchased or sold securities, contains no hint of such a requirement of investment intent. Contrary to appellees' assertions, appellants do not fall within one of the specific categories which the Supreme Court held to be beyond coverage by the federal securities laws.
 
 
 41
 The test for determining the class of persons who satisfy the purchaser-seller requirement has been applied flexibly, See generally, Tcherepnin v. Knight, 389 U.S. 332 (1967), and has not been restricted to those who fall within the classic mold of an "investor". See, e. g., Jefferies & Co. v. Arkus-Duntov, 357 F.Supp. 1206, 1213 (S.D.N.Y.1973). Recovery often has been permitted even when the sale involved novel or atypical securities, See, e. g., SEC v. W. J. Howey Co., 328 U.S. 293 (1946), or where the plaintiffs, like appellants here, had no intention of investing in the specific security which they purchased or sold. See, e. g., A. T. Brod & Co. v. Perlow, supra; Weitzman v. Stein, 436 F.Supp. 895, 901-02 (S.D.N.Y.1977); American Bank & Trust Co. v. Barad Shaff Securities Corp., supra, 335 F.Supp. at 1280. Moreover, the requirement of a showing of investment intent has been specifically rejected in cases involving concealment of looting or mismanagement of a public corporation when the purchase or sale of a security actually is shown. Hooper v. Mountain States Securities Corp., 282 F.2d 195, 202 (5 Cir. 1960), Cert. denied, 365 U.S. 814 (1961).
 
 
 42
 Appellants here clearly have satisfied the purchaser-seller requirement of Blue Chip Stamps. The securities in question were purchased in appellants' names with appellants' funds. Appellants incurred the investment risk and sustained the losses resulting from defendants' fraudulent scheme. To require a further showing that appellants must have "intended to invest" in these securities would produce anomalous results. Here, for example, precisely because defendants were so successful in concealing from appellants the most fundamental aspect of their investment, the latter as purchasers would be stripped of their opportunity to recover. Nothing could have been further from the Congressional intent.
 
 
 43
 For these reasons, in reversing the district court's dismissal of the federal securities laws claims, I would hold that the complaint sufficiently states claims for relief under both Section 12 and Section 10(b)[7] and would remand for trial on the merits accordingly.
 
 III.
 
 44
 Turning next to the issues raised by the district court's dismissal of appellants' federal banking law claims, I concur with the majority's refusal to imply a private right of action under Section 11(m) of the Federal Reserve Act, 12 U.S.C. § 248(m) (1976), and I concur with its affirmance of the district court's dismissal of appellants' claims under that section. To the extent, however, that the majority reverses the district court's dismissal of appellants' claims under Sections 22(f) and 22(g)(4) of the Federal Reserve Act, I respectfully dissent.
 
 
 45
 Section 22(g)(4) prohibits a member bank of the Federal Reserve System from extending credit to any of its executive officers in excess of an aggregate amount of $5,000 outstanding at any one time.[8] Section 22(f) expressly provides for a private right of action against those directors or officers of a member bank "participating in or assenting to" violations of certain sections of the Act, including Section 22(g).[9] Such private action permits recovery "for all damages . . . sustained in consequence of such violation."[10]
 
 
 46
 The district court correctly held that appellants' complaint failed to allege all of the essential elements of a cause of action under Section 22(f); in particular, the complaint failed to allege a causal relationship between the asserted violations and the losses appellants claimed to have sustained. Although no court, so far as we know, has passed on what sort of causation is required under this section, the language "in consequence of such violation" clearly requires a showing of some causal connection.
 
 
 47
 Section 93 of the National Bank Act, 12 U.S.C. § 93 (1976), which provides for a private right of action for violations of Chapter 2 of Title 12 and contains language similar to Section 22(f),[11] has been construed to require a showing of some causal connection. Section 93 provides in relevant part:
 
 
 48
 "If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter, all the rights, privileges, and franchises of the association shall be thereby forfeited. . . . And in cases of such violation, Every director who participated in or assented to the same shall be held liable in his personal and individual capacity For all damages which the association, its shareholders, or any other person, shall have sustained In consequence of such violation." (emphasis added).
 
 
 49
 In cases arising under Section 93, courts uniformly have required proof of a causal relationship between a director's alleged violation and the damage that a plaintiff asserts. In some instances, courts have required that the plaintiffs allege that they "relied upon reports . . . falsely indicating compliance with (the section violated) to their injury." Harmsen v. Smith, 542 F.2d 496, 502 (9 Cir. 1976); Michelsen v. Penney, 10 F.Supp. 537, 540 (S.D.N.Y.1934). Cf. Chesbrough v. Woodworth, 244 U.S. 72, 77 (1917) (showing of reliance on statement of bank's condition required for Section 93 suit). Alternatively, plaintiffs have been required to show that the illegal loan was the primary factor resulting in the diminution of the value or the demise of their investment. Holman v. Cross, supra 75 F.2d at 911-12. Compare Corsicana National Bank v. Johnson, 251 U.S. 68, 87-88 (1919), With First National Bank of Lincolnwood v. Keller, 318 F.Supp. 339, 346-47 (N.D.Ill.1970). In the absence of allegations that the director's wrongdoing was the primary cause of the plaintiff's loss, no recovery has been permitted under Section 93.
 
 
 50
 Applying this analysis to the present case, the complaint clearly is insufficient. Appellants do not allege detrimental reliance on any misrepresentations with respect to compliance with Section 22(g)(4),[12] nor do they allege that the loans led to the failure of their investments.[13] Instead, they attempt to avoid the causation requirement by suggesting that executive officers also are liable for a Failure to disclose violations actionable under Section 22(f). Since reliance on material omissions has been held unnecessary in other related contexts, See, e. g., Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), appellants argue that it likewise should not be required here.
 
 
 51
 Appellants' reliance on Affiliated Ute and its progeny is misplaced. Those cases involved Section 10(b) of the Exchange Act, an antifraud provision intended to encourage disclosure of information material to investors; it does not prescribe any substantive standards apart from disclosure. See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 476-77 (1977). The rationale behind the elimination of the causation element in Affiliated Ute was that, because it is so difficult to prove reliance on a nondisclosure or a material omission, private enforcement of an action under Section 10(b) would have been intolerably encumbered in cases involving omissions. The Supreme Court accordingly thought it desirable to eliminate the reliance requirement[14] in order to foster the principal purpose of the statute disclosure. 406 U.S. at 152-54.
 
 
 52
 The harm that Section 22(f) of the Reserve Act guards against is quite different and calls for a different approach to private enforcement. Section 22(f) permits private claims to enforce certain enumerated provisions of the Act and thereby promote their objectives. None of these enumerated provisions demands disclosure. Rather they prescribe adherence to certain well defined substantive requirements. It is not nearly as difficult to show the causal relationship required by Section 22(f) as it is to show that one would have acted differently had certain information been disclosed. Thus, requiring a causal relationship between the violation and the loss will not frustrate the purposes for which Section 22(f) was enacted.
 
 
 53
 I therefore would hold that a party bringing suit under Sections 22(f) and 22(g)(4) of the Federal Reserve Act must allege a causal connection between the asserted illegal loan and the loss sustained. Since appellants failed to allege such a causal connection, their complaint was properly dismissed.[15]IV.
 
 
 54
 Finally, I am constrained to comment on the propriety of the remand in this case particularly the failure of the majority to rule on certain legal issues for the guidance of the district court and counsel on remand.
 
 
 55
 Indeed, the difference between the majority and myself may well be one less of substance than of policy in determining when a legal issue is ripe for determination.
 
 
 56
 Our difference boils down essentially to the correctness of the district court's rulings on two issues: (1) that an essential element of appellants' securities laws claims is an allegation and proof that appellants had investor intent and knowledge for lack of which those claims were dismissed; and (2) that an essential element of appellants' banking law claims is an allegation of causal connection between the loss sustained and the asserted violation for lack of which those claims were dismissed. I agree with the district court's ruling on issue (2), but I disagree with its ruling on issue (1). On both issues, the majority avoids ruling squarely on the legal questions presented; it simply remands for the taking of evidence on each issue, deferring ruling on the legal questions until another day. It is the propriety of this type of remand that I question.
 
 
 57
 In the first place, each of the legal questions referred to above was squarely presented for our review by the district court's dismissal of the claims upon Rule 12(b)(6) motions by defendants, i. e. motions which squarely raised the issues by asserting "failure to state a claim upon which relief can be granted". This of course is the traditional method of raising legal issues for determination by the district court and for appellate review. Particularly in cases arising under the federal securities laws, many of the leading cases in the Supreme Court and in our Court have been the result of Rule 12(b)(6) motions.
 
 
 58
 Secondly, experience on the district court has taught that the one thing above all else that is most appreciated when a case is remanded is clear guidance to the district court as to precisely what it is expected to do on remand. In the instant case, Judge Metzner first filed a clear, concise opinion on November 23, 1977 ruling squarely on the legal questions presented by defendants' Rule 12(b)(6) motions. Then in his supplemental opinion of December 9, 1977 granting plaintiff's motion for a Rule 54(b) certificate, Judge Metzner stated, "If this court is in error in its view of the law, a tremendous duplication of time, effort and legal expense will be avoided if that error is corrected promptly."
 
 
 59
 With deference, I do not believe that the majority's remand, after declining to rule on the two critical legal questions presented, provides the guidance to which the district court is entitled guidance which Judge Metzner specifically invited in granting the Rule 54(b) certificate. On the contrary, I fear that our remand may be an invitation to counsel "to flail around and raise a considerable amount of dust, with the inevitable risk that some may settle . . . .", United States v. Katz, 425 F.2d 928, 930 (2 Cir. 1970) (Friendly, J.), and then to return to us about two years hence for rulings on the legal questions that we should be deciding today.
 
 
 60
 Accordingly, I concur in part and dissent in part, as stated at the outset of this opinion.
 
 
 
 [1]
 Plaintiffs' complaint also contained claims based upon common law fraud, conversion, and negligence. These pendent claims were dismissed following dismissal of the federal statutory claims, See United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and this disposition is not challenged on appeal
 
 
 [2]
 David Graiver was reportedly killed in the crash of a private plane in Acapulco, Mexico, on August 7, 1976
 
 
 [3]
 These issues have already been raised in administrative proceedings conducted before the FDIC
 
 
 [4]
 Appellants did allege that the "time deposits" of BAS, the "certificates" of New Loring, and the "commercial paper" of ABT Corp. were securities. However, the district judge found it unnecessary to decide this issue, because he concluded that appellants did not intend to invest in these companies. We likewise make no determination on this point, assuming for the argument, as did the district court, that the proof might show these documents to be securities
 
 
 [5]
 We are also mindful of the possibility that the district court may have to look beyond the face of the instruments in order to determine whether the certificates of deposit in this case were securities. See SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 355, 64 S.Ct. 120, 88 L.Ed. 88 (1943)
 
 
 [6]
 Regulations of the Board of Governors of the Federal Reserve System provide that loans to a partnership in which a bank's executive officer has a majority interest shall be treated as a loan to the executive officer. 12 C.F.R. §§ 215.3, 215.4. Under FDIC rules relating to unsafe and unsound banking practices, policy-making officers come within the definition of "insiders", and an "insider' transaction" is defined as one between the bank and "(a)ny other person where the transaction inures to the tangible economic benefit of an insider. . . . " 12 C.F.R. § 337.3(a)(6)(iv)
 
 
 [7]
 Under section 96(5) of the New York Banking Law, officers of a New York Bank that becomes a member of the Federal Reserve Bank shall continue to be subject to all liabilities and duties imposed upon them by state banking laws. Section 7017 of the same Law provides a remedy for violations of these duties
 
 
 [1]
 Specifically, ABT had been criticized for a large proportion of high risk loans relative to its total loans and adjusted capital, for an atypically high concentration of extensions of credit to individuals or closely related entities, and for deficient supervision by its directors and senior management
 
 
 [2]
 The ABT confirmation of BAS investments read as follows:
 "Re: Brussels Time Deposit
 "Re: Reference No.
 Dear Client(s)
 This will confirm our investment for you as marked above in your name(s):
 ( ) The funds were drawn from your ( ) Checking Account ( ) Savings Account ( ) proceeds of your C/P/CD/TD.
 ( ) Interest earned was credited to your ( ) Checking Account ( ) Savings Account ( ) Paid by Check No.
 ( ) Principal plus interest renewed as shown above.
 ( ) Please advise us shortly before maturity as to what disposition should be made of the funds when they become due.
 ( ) Unless we are advised to the contrary at maturity the principal plus interest will be automatically renewed for a further period of days at the rate of interest then prevailing and permitted."
 The ABT confirmation of New Loring investments read as follows:
 "Dear Clients:
 As per instruction received from you, we are pleased to confirm that we have invested the sum of $ in New Loring, Inc. As evidenced by a photocopy of Certificate No. , your investment will continue for days and mature on earning interest at the rate of % Per annum which interest will be paid to you on a basis by .
 The original of the enclosed certificate in your name will be held with us for safekeeping in your name at no charge.
 The abovementioned investment will be payable at maturity at the counters of American Bank and Trust Company therefore, please advise us shortly before maturity of the disposition you wish to make of the funds at maturity.
 On behalf of New Loring, Inc., please accept our thanks for your confidence in placing this investment."
 The ABT confirmation of Holding Company investments read as follows:
 "Re: ( ) Commercial Paper
 "Re: ( ) Certificate of Deposit
 "Re: ( ) Geneva/London Time Account
 Dear Client(s):
 This will confirm our investment for you as marked above in your names.
 ( ) The funds were drawn from your ( ) Checking Account ( ) Savings Account ( ) proceeds of your TD/TID/LTA/TD.
 ( ) Principal plus interest were renewed as shown above.
 ( ) Principal plus interest earned were credited to your ( ) Checking Account ( ) Savings Account ( ) Paid by Check No.
 ( ) Please advise us shortly before maturity as to what disposition should be made of the funds when they become due.
 ( ) Unless we are advised to the contrary at maturity, the principal plus interest will be automatically renewed for a further period of days at the rate of interest then prevailing and permitted."
 
 
 [3]
 See TSC Industries, Inc. v. Northway Inc., 426 U.S. 438, 448-49 (1976)
 
 
 [4]
 Section 12 of the 1933 Act, 15 U.S.C. § 77L (1976), provides in relevant part:
 "Any person who
 (1) offers or sells a security in violation of section 77e of this title, or
 (2) offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, . . . not misleading . . .
 shall be liable To the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." (emphasis added).
 
 
 [5]
 Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) (1976), provides in relevant part:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."
 Rule 10b-5 under the 1934 Act, 17 C.F.R. § 240.10b-5 (1977), provides in relevant part:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."
 
 
 [6]
 Subsequent to our decision in the instant case, the Supreme Court held in the context of a criminal prosecution that the government need not prove some impact of a fraudulent scheme on an investor under § 17(a)(1). United States v. Naftalin, ---- U.S. ---- (1979), 47 U.S.L.W. 4574 (U.S. May 21, 1979)
 
 
 [7]
 As an alternative ground for reversing the district court's dismissal of appellants' securities laws claims, appellants and the SEC in its amicus brief urge us to hold that time deposits of ABT are "securities" within the meaning of Section 2(1) of the 1933 Act and Section 3(a)(10) of the 1934 Act. The FDIC in its amicus brief urges to the contrary. I agree with the majority, in view of our remand of the securities laws claims for trial, that we need not reach this question today; nor is it necessary to determine the extent to which the protections afforded domestic time deposits in the Federal Deposit Insurance Act, 12 U.S.C. § 1811 et seq. (1970), may supplant the protections provided by the securities laws
 
 
 [8]
 Section 22(g)(4) of the Reserve Act, 12 U.S.C. § 375a(4) (1976), provides:
 "(4) General limitation on amount of credit
 A member bank may make extensions of credit not otherwise specifically authorized under this section to any executive officer of the bank, not exceeding the aggregate amount of $5,000 outstanding at any one time."
 
 
 [9]
 Section 22(f) of the Reserve Act, 12 U.S.C. § 503 (1976), provides:
 "If the directors or officers of any member bank shall knowingly violate or permit any of the agents, officers, or directors of any member bank to violate any of the provisions of sections 375, 375a (Reserve Act § 22(g)), and 376 of this title or regulations of the board made under authority thereof, or any of the provisions of sections 217, 218, 219, 220, 655, 1005, 1014, 1906, or 1909 of title 18, Every director and officer participating in or assenting to such violation shall be held liable in his personal and individual capacity For all damages which the member bank, its shareholders, or any other persons shall have sustained In consequence of such violation." (emphasis added).
 
 
 [10]
 Id
 
 
 [11]
 The similarity of the manner in which these two provisions condition the personal civil liability of directors for violations has been recognized by the Sixth Circuit in Holman v. Cross, 75 F.2d 909, 911 (6 Cir. 1935)
 
 
 [12]
 Appellants do allege that in March of 1976, Juan Graiver submitted an affidavit to the Superintendent of Banks, in which he represented that he would not borrow from ABT to finance his pending purchase of Holding Company stock. Appellants, however, do not allege that they relied on this misrepresentation
 
 
 [13]
 Indeed, since the extensions of credit were made to BAS, New Loring and Holding Company the very entities in which appellants' funds were invested it would seem that the illegal loans buttressed their investments rather than undermining them
 
 
 [14]
 While this difficulty of proof relieves the plaintiff of the burden of establishing causation, in order to protect against windfalls to such litigants the courts have not foreclosed defendants from presenting direct evidence of nonreliance in order to rebut the presumption and thereby disprove causation. See Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 375 (2 Cir.), Cert. denied, 414 U.S. 910 (1973). Accord, Chelsea Associates v. Rapanos, 527 F.2d 1266, 1272 (6 Cir. 1975); Thomas v. Duralite Co., 524 F.2d 577, 585-86 (3 Cir. 1975); Carras v. Burns, 516 F.2d 251, 257 (4 Cir. 1975)
 
 
 [15]
 By the very nature of the transaction under attack, it is highly doubtful that there could have been any causal connection between the loss sustained and the asserted violation. As Judge Metzner pointed out, after noting that plaintiffs do not allege any causal relationship between the loan to ABT's board chairman and any injury sustained by plaintiffs:
 "Any injury resulting from the transaction would have been to the bank. Plaintiffs' alleged injury flowed from the failure of the defendants to create deposits in ABT in the names of the plaintiffs. Plaintiffs never became depositors in the bank, nor do they claim that their money was involved in the loan transaction." Adato v. Kagan, supra, at 92,622.
 This undoubtedly is the reason plaintiffs not only did not allege any causal connection between the loss sustained and the asserted violation, but also never sought leave to amend their complaint to make the necessary allegation.